**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| SHANNON SPUHLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 4:20-CV-910 PLC |
| | ) |
| KILOLO KIJAKAZI,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Shannon Spuhler seeks review of the decision of Defendant Social Security Acting Commissioner Kilolo Kijakazi denying her application for Disability Insurance Benefits (DIB) under the Social Security Act. For the reasons set forth below, the Court affirms the Commissioner's decision.

**I.      Background and Procedural History**

On June 20, 2018, Plaintiff, who was born in November 1970, filed an application for DIB, alleging she was disabled as of November 20, 2017, as a result of a "bad right knee." (Tr. 49-50, 127-135, 160-166)  The Social Security Administration (SSA) denied Plaintiff's claim, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 49-56, 64, 66-67)  The SSA granted Plaintiff's request for review and conducted a hearing on August 14, 2019. (Tr. 86-114)  On February 4, 2020, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 7-24)  Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council,

---

[1] Kilolo Kijakazi became the Acting Commission of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of 205(g) of the Social Security Act, 42 U.S.C. §405(g).

which denied review. (Tr. 1-4)  Plaintiff has exhausted all administrative remedies, and the ALJ's

decision stands as the Commissioner's final decision.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.    Evidence Before the ALJ[2]

### A.   Medical Records[3]

On approximately October 1, 2017, Plaintiff twisted her right knee while exiting her

vehicle. (Tr.  54)  On October 18, 2017, Daniel Schwarze, M.D., an orthopedic surgeon, conducted

a physical examination of Plaintiff, placed her on light duty, and ordered a magnetic resonance

imaging (MRI) of Plaintiff's right knee. (Tr. 273) Prior to surgery, Dr. Schwarze observed bilateral

meniscal tears, osteoarthritis of the patellofemoral joint, and mild synovitis throughout the joint.

(Tr.  258-260, 271-274) On November 22, 2017, Dr. Schwarze performed an arthroscopy with

debridement and medial meniscectomy. (Tr. 258-260)  Following surgery, Dr. Schwarze referred

Plaintiff to physical therapy. (Tr.  270)

In January 2018, Plaintiff reported increased pain with knee buckling to Dr. Schwarze.

(Id.)  Dr. Schwarze noted Plaintiff could flex her right knee to 90 degrees and that her strength in

the right lower extremity was 4/5. (Id.)

---

[2] Plaintiff does not challenge the ALJ's determination that her alleged condition of a shoulder impairment was not medically determinable. Plaintiff also does not challenge the ALJ's determinations that: (1) her physical impairment of overweight/obesity and mental impairment of mixed depression with anxiety were non-severe and (2) the ALJ's assessment of these conditions in determining her RFC. As such, the Court limits its discussion of the evidence to Plaintiff's severe impairments, namely osteoarthritis of the right knee and right knee meniscus tear status post-arthroscopy.

[3] Plaintiff filed a "statement of undisputed facts" which included approximately seven facts, general biographical and procedural dates, but did not include a recitation of the relevant medical records and evidence. Instead, Plaintiff states only that "the agency made findings as set forth in the final agency decision at Tr. 10-21, which is not disputed by [Plaintiff], who disputes the analysis not the fact that findings were made." Defendant admitted the facts as set forth in the Plaintiff's statement of undisputed facts. Accordingly, the Court accepts the facts as presented in the ALJ's decision but will discuss only the relevant medical records in detail.  [ECF Nos. 19-1, 23, 27-1]

In April 2018, Plaintiff was discharged from physical therapy. (Tr. 279) Plaintiff reported that her pain levels ranged from 4 to 9 out of 10 when walking on uneven ground, squatting, and climbing stairs and that her knee "locks up" and "giv[es] out while walking[.]" (Id.) Treatment notes state Plaintiff had improved range of motion and strength, and less tenderness to the touch. (Tr. 280) Plaintiff was described as progressing well and was not assessed to be a fall risk at that time. (Tr. 279-280)  The provider discharged Plaintiff for noncompliance, noting she had not attended therapy for more than a month, and was advised that she return to full therapy sessions. (Tr. 280).

On January 10, 2019, Plaintiff sought care with Jesse Helton, D.O., at Comtrea on the advice of her disability representative. (Tr. 295)  Plaintiff reported pain, "popping and locking," decreased range of motion, weakness, and swelling of her right knee since surgery. (Tr. 296-97) Plaintiff stated her knee frequently "gives out" causing her to fall five to six times a month. (Tr. 296) During the examination, Dr. Helton observed small effusion and anteromedial joint line tenderness but no ligamentous laxity. (Tr. 297)  Dr. Helton administered a cortisone injection and Plaintiff reported 75 percent improvement in the pain. (Id.)

On January 25, 2019, Austin Montgomery, M.D. performed a consultative examination. (Tr. 309)  Plaintiff experienced pain while walking and when bending or straightening her knee. (Id.)  Plaintiff reported falling four to six times per month when her knee "gives out." (Id.)  Dr. Montgomery observed that Plaintiff walked with a slight limp but not on her toes or heels. (Tr. 311)  Plaintiff was able to partially squat and had a normal station. (Id.)  Plaintiff was able to get on and off the examination table but unable to sit on the table for very long. (Tr. 310-311) Dr. Montgomery observed that Plaintiff was "in distress with her knee" and had "to sit a certain way with the knee in a certain position[.]" (Tr. 310)  Plaintiff flexed her right knee to 130/150 degrees

and her right lower extremity strength was 4/5. (Tr.  315-316)  Dr. Montgomery did not observe any edema in Plaintiff's extremities. (Tr.  311).

Plaintiff subsequently returned to Comtrea for treatment.  (Tr.  298)  On June 5, 2019, Plaintiff saw Ashley Whitley, PRN and FNP-C.  (Tr. 300)  Plaintiff stated she wore a right knee brace daily and that she overused Tylenol and Ibuprofen for pain. (Id.)  Plaintiff also stated she fell six to eight times per month and that she was not able to perform her activities of daily living due to knee pain. (Id.)  Nurse Whitley documented "tenderness and limited [range of motion]" but did not specify if this related to Plaintiff's right knee or some other area. (Id.)  At that appointment, Plaintiff was wearing a right knee brace and was ambulating normally. (Id.)

At another visit later that month, Plaintiff was wearing a right knee brace and reported she had "to use a cane in the community due to instability of her gait." (Tr.  325-26)  Nurse Whitley again observed that Plaintiff was ambulating normally and documented that Plaintiff suffered from unspecified "tenderness and limited [range of motion]." (Tr.  326)   Although Plaintiff was "clinically stable[,]" Nurse Whitely directed Plaintiff to continue wearing her knee brace for stability and advised her to use a walker in the community for safety. (Id.)

In July 2019, Plaintiff saw Ashleigh McGrath, NP at Comtrea. During this visit, Plaintiff reported her "knee gives out regularly." (Tr.  337) Plaintiff was wearing a right knee brace and Nurse McGrath observed that Plaintiff was ambulating normally. (Id.) Again, the provider documented unspecified tenderness and limited range of motion and advised Plaintiff to wear her knee brace and use a walker for stability. (Tr.  338)

On September 18, 2019, Plaintiff went to the emergency room at St. Clare Hospital after falling and landing on her knee earlier that day. (Tr.  344-46)  Plaintiff reported falling several times per month since her surgery.  (Tr.  346)  During the examination, Plaintiff had "tenderness

in the entire right anterior knee" and slight bruising. (Tr.  345-46, 348)  Plaintiff's range of motion

was intact but painful with flexion. (Tr.  348) There was no laxity to the knee and her strength in

the lower extremities was 5/5. (Id.) An x-ray of the knee was negative, showing no fracture,

malalignment, or joint effusion. (Tr.  349-51) The provider prescribed pain medication and

encouraged Plaintiff to wear a knee brace and to use a walker, noting Plaintiff stated she had not

been using these which was "probably contributing to her pain and falling[.]" (Tr.  350)

After the August 2019 hearing, the ALJ referred Plaintiff to Alan Morris, M.D. for an

orthopedic consultative examination. (Tr.  355)  At the examination in October 2019, Dr. Morris

noted the prior knee surgery and osteoarthritis of the right knee with medial compartment

narrowing in the pre-operative x-ray. (Tr.  355-56)  Plaintiff told Dr. Morris she wore a knee brace

but that her knee continued to catch and give way, causing her to fall. (Tr.  356)  Plaintiff advised

Dr. Morris that she used a cane or walker "full-time." (Id.) Plaintiff reported being able to complete

all activities of daily living on her own but was "limited" because of her cane, brace, and constant

pain. (Id.)  Plaintiff stated she could sit for 30 minutes, stand for 30 minutes, and walk for 20

minutes. (Id.)  Dr. Morris observed Plaintiff walk 50 feet but with "a severe limp favoring the right

lower extremity[.]" (Id.)  Plaintiff walked with her right knee flexed 20 degrees and used a "rather

short" cane that she heavily leaned on. (Id.) Plaintiff explained that the cane belonged to her

mother. (Id.)  Plaintiff was unable to squat or to heel walk, toe walk or tandem gait due to right

knee pain. (Id.)  Plaintiff rose from a chair without difficulty but did not attempt to sit on the

examination table due "her pain and limitation of motion." (Tr.  357) Dr. Morris documented that

Plaintiff had a limited range of motion with only 90 degrees of flexion. (Id.)

Dr. Morris found right thigh 2-centimeter atrophy compared to the left thigh and a one centimeter increase in the size of the right knee as compared to the left knee. (Id.)  Dr. Morris observed "global tenderness" of the right knee and stated he could not "palpate the knee well enough to determine joint effusion because of [Plaintiff's] hypersensitivity to touch." (Id.)  Dr. Morris also did not test Plaintiff's ligament laxity due to pain. (Id.)  Dr. Morris found "[n]o evident joint deformity" and that Plaintiff's joints were "stable and nontender." (Tr. 357)  Plaintiff's lower extremity strength was 5/5 and she had no sensory abnormalities. (Id.)  An x-ray of the right knee showed "medial joint space narrowing" but Dr. Morris wrote in his report that the x-ray showed "a complete loss of medial joint space[.]" (Tr. 358-59)

On November 30, 2019, Plaintiff again presented to the emergency room at St. Clare Hospital after falling. (Tr. 366-368)  Plaintiff reported falling up to four times per week, wearing a hinged brace, and "us[ing] [a] walker at times." (Tr. 369)  Plaintiff exhibited decreased range of motion and general tenderness but no laxity, swelling, or deformities. (Tr. 371)  Plaintiff's knee had normal alignment and normal patellar mobility. (Id.) An x-ray of the right knee was unremarkable, including for osteoarthritis. (Tr. 373)  Plaintiff refused pain medications, stating "if her pain is 'masked' she will push herself to become active." (Id.) The provider noted "[Plaintiff] has a brace although she did not bring it with her today and declines any other assistive device as she has a walker in the car." (Id.)

B. Function Report

In a July 2018 function report, Plaintiff stated she cared for her pets, attended to her personal care, and prepared multiple-dish meals. (Tr. 169)  Plaintiff continued to do household chores and yard work but took breaks to rest or elevate and ice her knee if it started to swell.  (Tr. 175-177)  At that time, Plaintiff drove her truck and went out alone, including shopping for food

and other items for one to one and half hours. (Tr.  171)  Plaintiff spent time with friends two to three days per week, and fished, swam, or shopped. (Tr.  177) Plaintiff reported her knee pain forced her to cancel her plans at times and she was no longer able to hike or "explore" the outdoors as compared to before her injury. (Id.)  Plaintiff reported her right knee was "swollen and stiff" most of the day. (Tr.  175)

### C.  Plaintiff's Testimony

At the August 14, 2019 hearing, Plaintiff  reported living with her mother and older sister. (Tr.  34-35)  Plaintiff testified she "was always very active" prior to injuring her right knee.  (Tr. 38)  Following her injury, however, Plaintiff frequently fell due to her "knee giving out." (Tr.  33) Plaintiff wore a knee brace which "g[ave] her a split second to grab something before she [fell]." (Tr.  39)  Plaintiff testified her condition prevented her from continuing her exercises at home after she was discharged from physical therapy.  (Tr.  32)

Plaintiff advised that Dr. Helton initially suggested she use a cane but then suggested she use a walker because Plaintiff was not "catching herself with [the cane]." (Tr.  34) Plaintiff testified Dr. Helton did not prescribe a walker because Plaintiff "had access to one through her mother." (Id.)

### D.  Vocational Expert's Testimony

Vocational expert Kristine Skahan also testified at the hearing. (Tr.  41) The ALJ asked Ms. Skahan to consider a hypothetical individual with Plaintiff's age, education, and work experience who could perform sedentary work with the following limitations:

> Never climb ladders, ropes, and scaffolds. Rarely climb ramps and stairs. ropes, ladders, scaffolds. Occasionally stoop, crouch. Never, kneel, crawl. Uses an assistive device to balance. That's one of the reasons I'm limiting it to sedentary. Tell me if there is a difference between cane and walker with respect to sedentary work.

(Tr.  42)  Ms. Skahan concluded there was no difference between a cane and walker in that situation because the person would spend most of her time seated and lifting would be negligible. (Id.)  Ms. Skahan testified that while she has not found the use of assistive devices "to be problematic in a sedentary office situation[,]" a person using a walker is more suited to "office type work" instead of "a production type setting." (Id.)

The ALJ modified the hypothetical to include "limited to routine repetitive tasks and low-stress jobs which is defined as occasional decision making and occasional changes in the work setting." (Id.)  In response to the modified hypothetical, Ms. Skahan testified Plaintiff's past work as a nurse aid[4] was eliminated but Plaintiff could perform unskilled sedentary jobs such as order clerk (food and beverage), document preparer, and administrative support worker. (Tr.  41-43)  Upon questioning by Plaintiff's representative, Ms. Skahan testified it would be "virtually impossible to perform even at [the] sedentary" level if Plaintiff had "to intermittently throughout the day" elevate her leg "higher than one foot…off the ground[,]" unless she elevated her leg "outside of [her] workstation" while on breaks.  (Tr.  45-46)

## III.    Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot,

---

[4] Ms. Skahan testified Plaintiff's past work as a nurse aid was classified as semi-skilled and medium duty. (Tr.  41) Ms. Skahan stated Plaintiff's reported performance in the position classified as heavy duty. (Id.)

8

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ....”  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the ALJ engages in a five-step evaluation process.  See 20 C.F.R. § 404.1520(a).  Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity.  Id.  Second, the claimant must establish that he or she has a “severe impairment,” defined as “any impairment or combination of impairments which significantly limits [claimant’s] physical or mental ability to do basic work activities.”  20 C.F.R. § 404.1520(a), (c).  “The sequential evaluation process may be terminated at step two only when the claimant’s impairment or combination of impairments would have no more than a minimal impact on [the claimant’s] ability to work.”  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)).  At step three, the ALJ considers whether the claimant’s impairment meets or equals an impairment listed in 20 C.F.R., Pt. 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(a), (d).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 404.1520(d)

Prior to step four, the Commissioner must assess the claimant’s residual functional capacity (RFC), which is “the most a claimant can do despite [his or her] limitations.”  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); 20 C.F.R. § 404.1520(a), (e). RFC is “based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual’s own description of his [or her] limitations.”  Id. (quoting Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006)).

At step four, the ALJ determines whether the claimant can return to his or her past relevant work by comparing the claimant’s RFC with the physical and mental demands of the claimant’s

9

past relevant work.  20 C.F.R. § 404.1520(a), (f); <u>see</u> <u>McCoy v. Astrue</u>, 648 F.3d 605, 611 (8th

Cir. 2011). If the claimant can still perform past relevant work, the claimant will not be found to

be disabled; if the claimant cannot, the analysis proceeds to the next step.  <u>McCoy</u>, 648 F.3d at

611.

    Through step four, the burden remains with the claimant to prove that he or she is disabled.

<u>Moore</u>, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given

the claimant's RFC, age, education, and work experience, there are a significant number of other

jobs in the national economy that the claimant can perform. 20 C.F.R §§ 404.1520(a), (g);

404.1560 (c); <u>Brock v. Astrue</u>, 674 F.3d 1062, 1064 (8th Cir. 2012). If the claimant cannot make

an adjustment to other work, then he or she will be found to be disabled.  20 C.F.R. § 404.1520(g).

## IV.    ALJ's Decision

    Applying the five-step evaluation process, the ALJ found Plaintiff: (1) had not engaged in

substantial gainful activity since November 20, 2017, the alleged onset date; and (2) had the severe

impairments of osteoarthritis of the right knee and right knee meniscus tear status post arthroscopy.

(Tr. 12) The ALJ concluded Plaintiff had the non-severe impairments of overweight/obesity and

"mixed depression with anxiety[.]" (Tr.  13) The ALJ found Plaintiff's alleged impairment of a

right shoulder injury was not medically determinable. (Tr.  14)

     At step three, the ALJ determined Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1, specifically the listing for 1.02A.  (<u>Id.</u>)

    The ALJ determined Plaintiff had the RFC to:

    perform light work as defined in 20 CFR 404.1567(b) except: [Plaintiff] can
    occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds.
    She can stand/walk for 6 hours in an 8-hour work day. She should never climb

ropes, ladders or scaffolds and should rarely climb ramps and stairs. She is able to occasionally stoop and crouch but never kneel or crawl.

(Id.)  In making this determination, the ALJ found "[t]here was no evidence to support the need to use an assistive device at all times, as argued by [Plaintiff's] representative."

The ALJ concluded the vocational evidence was insufficient to determine whether Plaintiff could perform any past relevant work but determined "no further vocational development is necessary" and proceeded to step five of the evaluation process.  (Tr.  20)  Based on the RFC, Plaintiff's age, education, and prior work experience, and the vocational expert's testimony, the ALJ found Plaintiff was able to perform other jobs that existed in significant numbers in the national economy, such as order clerk, document preparer, and administrative support worker. (Tr. 21)  The ALJ therefore concluded Plaintiff was not disabled. (Id.)

**V.     Discussion**

Plaintiff argues the ALJ's RFC determination was not supported by substantial evidence because the ALJ failed to "fairly account" for Plaintiff's use of a cane as an assistive device in the RFC. Specifically, Plaintiff asserts the ALJ failed to: (1) explain her reasons for not including Plaintiff's use of a cane in the RFC assessment and (2) "account for how [Plaintiff] might 'carry 20 pounds' or 'carry 10 pounds' while using one hand for a cane, or two for a walker[.]"  [ECF No 19 at 6-7, 11]   Plaintiff also contends the ALJ improperly weighed the medical opinion evidence, in that she erred in discounting Dr. Morris' observation that Plaintiff suffered from "hypersensitivity" in her knee.  [ECF No. 19 at 7-12]

In response, the Commissioner argues the ALJ's RFC determination is supported by substantial evidence, including the medical records concerning Plaintiff's treatment, Plaintiff's reported daily living activities, and the opinions of state agency medical consultants. [ECF No. 27]. The Commissioner also asserts the ALJ properly evaluated the evidence in the record and that

the ALJ's finding that Dr. Morris' consultative examination report was at odds with the remainder of the medical evidence was supported by substantial evidence. [ECF No. 27 at 12-13]

    A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's determination, [but it] may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

    B.  The ALJ's Assessment of Dr. Morris' Consultative Examination Report[5]

Plaintiff argues the ALJ erred in discounting Dr. Morris report and observation that Plaintiff suffered from "hypersensitivity" of the right knee. Plaintiff contends Dr. Morris' report corroborated Plaintiff's assertions that she required a cane or other handheld assistive device.

---

[5] For ease of understanding, the Court will address Plaintiff's claims out of order.

[ECF No. 19 at 7-12] In response, the Commissioner contends the ALJ properly evaluated the medical opinion evidence in conjunction with the other evidence in the record.   [ECF No. 5-8]

For claims filed on or after March 27, 2017, such as Plaintiff's claim, the regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. Rather, the ALJ will consider all medical opinions according to several enumerated factors: supportability, consistency, relationship with the claimant (e.g., length, frequency, purpose, and extent of treatment), and specialization. Id. The most important factors are supportability and consistency.   Id.

The ALJ determined Dr. Morris' report was unpersuasive because his findings were inconsistent both internally and with the other medical evidence. (Tr.  19-20). The ALJ observed that Dr. Morris' finding of "hypersensitivity" of Plaintiff's right knee was not documented by any other medical provider, including during an emergency room visit the month after Dr. Morris' examination. The ALJ also noted that no other medical provider documented any atrophy of Plaintiff's right leg, that Plaintiff walked with her right knee flexed, or that Plaintiff used a cane during an examination. (Tr. 19)  Furthermore, the ALJ concluded that Dr. Morris' report was "called into question" by his assessment of the imaging results taken at his examination. Dr. Morris stated in his report that the x-ray showed a "complete loss of medial joint space[.]" (Id.)  However, the x-ray actually noted "medial joint space narrowing." The ALJ found Dr. Morris' assessment of the imaging results was further undermined by an "unremarkable" x-ray taken by a different provider the following month. (Id.)

Plaintiff contends that the ALJ erred in discounting Dr. Morris' observations simply because other providers failed to make similar findings during their examinations. Plaintiff

maintains that Dr. Morris' observations are "supported" because he is an orthopedic surgeon who "performed a <u>direct</u> examination" and that "it is not a reflection on Dr. Morris that hypersensitivity was not found at other examinations[.]" [ECF No 19 at 7-8].

Plaintiff's argument is no more than a request for this Court to reweigh the evidence, a task not permitted on review. <u>Renstrom</u>, 680 F.3d at 1064.  Here, the ALJ was presented with conflicting medical evidence, and it was her duty to weigh that evidence. The ALJ provided an adequate basis for discounting Dr. Morris' report, namely that his report was inconsistent both internally and with the other medical evidence in the record.  The Court finds the ALJ did not err in finding that the record as a whole was inconsistent with Dr. Morris' observations.

C.  <u>RFC</u>

Plaintiff asserts the ALJ's RFC determination was not supported by substantial evidence because the ALJ failed to "fairly account" for Plaintiff's use of a cane as an assistive device in the RFC. Plaintiff contends the ALJ failed to explain her reasons for not including Plaintiff's use of a cane in the RFC assessment or to account for how Plaintiff could carry items weighing 10 to 20 pounds while using a handheld assistive device. [ECF No 19 at 6-7, 11] The Commissioner responds that the ALJ's RFC determination is supported by substantial evidence, including Plaintiff's treatment records, Plaintiff's reported daily living activities, and the opinion of the state agency medical consultant. [ECF No. 27]

RFC is the most a claimant can do in a work setting despite the claimant's physical or mental limitations. <u>Martise v. Astrue</u>, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. § 404.1545(a)(1). The ALJ determines a claimant's RFC "based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own

descriptions of [his or her] limitations." Kraus v. Saul, 988 F.3d 1019, 1024 (8th Cir. 2021) (quoting Papesh v. Colvin, 786 F.3d 1126, 1131 (8th Cir. 2015)); 20 C.F.R. § 404.1545(a)(1).

Plaintiff's argument that the ALJ should have included the use of a handheld assistive device, specifically a cane, in the RFC is primarily based on Plaintiff's contention that she needed an assistive device to prevent her from falling when her knee locked up or gave out.  In determining the credibility of a plaintiff's subjective complaints, a court considers the following factors: 1) the claimant's daily activities; 2) the duration, intensity, and frequency of the symptoms; 3) precipitating and aggravating factors; 4) the dosage, effectiveness, and side effects of medication; 5) any functional restrictions; 6) the claimant's work history; and 7) the absence of objective medical evidence to support the claimant's complaints.  Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) and Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000)). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).  See also McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013).

The ALJ found "[t]here was no evidence to support the need [for Plaintiff] to use an assistive device at all times, as argued by her representative." (Tr. 19). The ALJ noted that Plaintiff "reported falls occurring at varying rates of frequency"[6] but found "no evidence of laxity of the knee in any examination" and "[n]o other objective evidence showed an etiology for her reported falls." (Id.) Furthermore, none of Plaintiff's treatment providers documented witnessing any instability in Plaintiff's gait. While some providers recommended Plaintiff use a cane or a walker for stability, the ALJ found these recommendations "seemed to rely on [Plaintiff's] reports of

---

[6] The ALJ noted discrepancies in the number of falls Plaintiff reported to her providers. (Tr. 19)  Plaintiff reported falling as few as four to six times per month and as many as four times per week. (Tr. 309, 369)

instability, without objective evidence in support thereof[.]" (Id.)  Although Plaintiff used a short cane belonging to her mother during Dr. Morris' consultative examination, no other examiner or treatment provider documented Plaintiff's use of a cane or walker. (Id.)  On several occasions, Plaintiff advised her treatment providers that she had left her assistive device in her car. (Id.)

The ALJ considered Plaintiff's subjective complaints within the context of the entire record and concluded the record undermined the credibility of Plaintiff's claim that she had a medical need for a handheld assistive device. The ALJ's determination not to credit Plaintiff's claim was supported by "good reasons and substantial evidence" and, therefore, the Court defers to her determination.  See Gonzales, 465 F.3d at 894. Because the ALJ found Plaintiff did not have a medical need for a handheld assistive device, it was not necessary for the ALJ to include the use of such a device in the RFC.

## VI.    Conclusion

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports Defendant's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of August, 2022